**BESHADA FARNESE LLP**
Donald A. Beshada (DAB 2909)
108 Wanaque Avenue
Pompton Lakes, New Jersey 07442
Telephone:    (973) 831-9910
Facsimile:    (973) 831-7371
Email:        dbeshada@gmail.com

*Attorneys for Plaintiff Ontel Products Corp.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ONTEL PRODUCTS CORP., a New Jersey corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CJ PRODUCTS, INC., a California corporation <br><br> Defendants. | DOCKET NO. <br><br> Civil Action <br><br> **VERIFIED COMPLAINT** |

Plaintiff Ontel Products Corporation ("Ontel"), a corporation organized under the laws of the State of New Jersey, with its principal place of business at 21 Law Drive, Fairfield, New Jersey, by way of Verified Complaint against Defendant CJ Products, Inc., a California corporation ("CJ" or "Defendant") says:

## NATURE OF THE CASE

1.      This matter involves CJ's breach of non-competition and confidentiality provisions of a certain February 2010 Manufacturing, Marketing and Distribution Agreement between Ontel and CJ (the "Agreement"), as well as CJ's misuse of confidential information of Ontel which Ontel previously shared with CJ pursuant to the

Agreement, related to a plush children's toy item called "Pillow Pets."  Pillow Pets is marketed as an "As Seen on TV" product.

2.     Pursuant to the Agreement, which is attached hereto as Exhibit A, CJ – in exchange for tens of millions of dollars in royalty payments and other consideration – agreed to license and/or assign all national, "big box" retailer distribution rights to Pillow Pets to Ontel on an **exclusive** basis.  To that end, the Agreement contains a clear and unambiguous Non-Compete provision, which precludes CJ from "manufacturing, marketing or distributing [Pillow Pets] or any other plush, foldable stuffed animals" to such retailers.  See Ex. A at p. 3, ¶1.2.

3.     The Agreement also contains a clear and unambiguous "Confidentiality" provision, which obligates CJ to hold, among other information, "customer lists, price lists, [and] written and unwritten marketing plans. . . in the strictest of confidence," and precludes CJ from disclosing any of said confidential information without the prior written consent of Ontel.  Id., at p. 10-11, ¶10.1.

4.     Due to the importance of the Non-Compete and Confidentiality requirements of the Agreement, the Parties also agreed to a separate "Injunction" provision related to a potential breach of those requirements.  That provision states:

> Each party acknowledges that a breach of the obligations not to compete under section 1.2, and/or confidentiality under section 10 will result in irreparable and continuing damage to the non-breaching party for which there will be no adequate remedy at law.  Accordingly, in the event of any such breach, the non-breaching party shall be entitled to temporary and/or permanent injunctive relief and/or an order for specific performance without bond, with respect to such breach. . . .

Id., at p. 11, ¶11.

5.      Notwithstanding its contractual obligations under paragraphs 1.2 and 10.1, and in a clear breach of those obligations, within the last month CJ utilized confidential pricing structures and other information provided to it by Ontel and began to sell and distribute Pillow Pets to Target.  That issue is not truly in dispute, as CJ has acknowledged its breaches of the Agreement, in writing, to Ontel.  See November 10, 2015 email from Michael Maizes, Esq. (attorney for CJ) to Donald A. Beshada, Esq. (attorney for Ontel), attached hereto as Exhibit B.

6.      As set forth more fully below, CJ's conduct is the precise conduct that the Parties specifically acknowledged would cause irreparable harm to Ontel.  Indeed, it is undisputed that CJ utilized confidential pricing structures, marketing ideas, product strategy, and relationships of Ontel in selling the Pillow Pets to Target, and violated the specific provision against non-competition that has eroded Ontel's good will with Target and now placed that relationship in jeopardy.  If CJ is not preliminarily and permanently enjoined from continuing to use Ontel's pricing structures, marketing ideas and related confidential information, and continuing to sell Pillow Pets to Target, Ontel– which has already been damaged by the bad faith conduct of CJ – will suffer irreparable harm.

**JURISDICTION AND VENUE**

7.      CJ and Ontel entered into the Agreement with Ontel on or about February 24, 2010.  See Exhibit A.  Paragraph 15.6 of the Agreement provides for jurisdiction and venue within the State of New Jersey.  See Ex A, p. 13, ¶15.6.  And, paragraph 11 of the Agreement provides that an action for an Injunction may be brought "in a court" at the option of the non-breaching party.  Id., at p. 11, ¶11.

8.      Pursuant to 28 U.S.C. §1332, Ontel and CJ are citizens of different states, and the amount in controversy exceeds the sum of $75,000. Thus, venue is proper in this District.

## THE PARTIES

9.      Ontel is a privately held New Jersey company that develops, markets, sells and distributes a variety of consumer goods, both through direct response marketing and TV/internet advertising (i.e., *As Seen on TV* infomercials) and, primarily, in retail channels.  Ontel was established in 1994.  Ontel is a corporation organized and existing under the laws of the State of New Jersey with a principal place of business located at 21 Law Drive, Fairfield, Essex County, New Jersey.

10.      CJ is, upon information and belief, a California corporation, with a principle place of business located at 2045 Corte Del Nogal, Carlsbad, California.  CJ is a company that manufactures, markets and distributes Pillow Pets and a limited amount of additional items, direct-to-consumers, in specialty retail stores (as opposed to in "big box" mass retail), and in small places such as mall kiosks.

## FACTS COMMON TO ALL COUNTS

### Ontel's Business Model

11.      Ontel is one of the largest "As Seen on TV" marketing companies in the United States.  Over many years, and at substantial expense, Ontel has established a network of industry contacts (including with marketing and television production companies), and contacts with major retailers (such as Target, Walmart and Toys 'R Us) and other business entities, involved with marketing, distribution and sale of "direct response"/ "As Seen on TV" consumer products on a large scale basis.

4

12.     In addition, and, again, at substantial expense, Ontel has developed a business model to market, distribute and sell As Seen on TV products to "big box" mass retailers, such as Walmart, Target, Toys 'R Us, on a large scale basis, and most, if not all, of the other major retailers in the United States.  That business model involves, among other things, pricing structures and marketing plans for such products. Critically, those pricing structures and marketing plans differ significantly from those directed at the smaller, "specialty" retail market, which includes, for example, "mom and pop" retailers, college bookstores, and localized specialty retailers.

13.     Given its vast retail distribution network and business model, Ontel is one of only about 5-6 companies in the United States who distribute and sell As Seen on TV products to big box retailers in large quantities.  As a result, Ontel is regularly asked by smaller companies that have discovered "winning" As Seen on TV products to partner with them to distribute and sell those winning items in mass retail.  The smaller companies simply do not have the necessary retail distribution network, financial wherewithal, and business model, to do so on their own.

14.   The mechanism by which Ontel partners with those smaller companies is, generally, through licensing agreements wherein the smaller companies license to Ontel the exclusive rights to manufacture, market, advertise, and distribute the products through Ontel's retail distribution network.

15.     In return, Ontel pays a royalty to the licensing party.  The amount of the royalty payments is typically significantly greater than the company could have ever obtained without Ontel, as Ontel, generally, sells several million units through its mass retail distribution network.

**The Ontel / CJ Relationship and Agreement**

16.     In January 2010, Ontel was introduced to CJ by Infomercials, Inc. ("II"). II is a well-known As Seen on TV production company, with a particular expertise in the development and production of television commercials for children's toy items.  At that that time, II was running a direct-to-consumer advertising campaign for CJ, and was assisting CJ in finding a potential partner to distribute Pillow Pets in mass retail.  II was doing those things because CJ had no knowledge (i) of the As Seen on TV business, (ii) on how to write and produce a direct response television commercial, (iii) of how to run a direct response television campaign, and (iv) of mass retail distribution.  CJ also had no money to support any of those things, even if they had such knowledge.  In a word, CJ had a product and a trademark, and had to hire II to manage all aspects of the business relationship.

17.     At that time, II asked Ontel if Ontel was interested in partnering with CJ to do the mass retail distribution of Pillow Pets, inasmuch as CJ, itself, did not have the money, contacts, business model or knowledge of the mass retail or As Seen on TV market to distribute and sell Pillow Pets to mass retail.

18.     After reviewing the commercial and the sales information related to the product, Ontel agreed to partner with CJ and to manufacture, market, sell and distribute Pillow Pets through its vast retail distribution network.   That arrangement was memorialized in the Agreement, which was executed by CJ on February 24, 2010, and by Ontel on March 2, 2010.  See Exhibit A.

19.     Under the Agreement:

a.      CJ granted to Ontel, on an **exclusive basis**, the "right, license and privilege throughout the World" to manufacture, distribute, sell, advertise, promote, and otherwise exploit Pillow Pets "and all improvements and modifications thereof" in all markets, including in all mass retail.  See Ex. A at ¶¶ 1.1, 1.1(a).

b.      CJ granted to Ontel the right, on an **exclusive basis**, to use all CJ patents, trademarks, artwork, packaging, endorsements, and television commercials related to Pillow Pets, in order to assist Ontel in manufacturing, advertising, marketing, selling and distributing Pillow Pets.  See Ex. A at ¶ 1.1(b) thru 1.1(h).

c.      The only "carve outs" to Ontel's exclusivity were the ability for CJ to sell (i) direct-to-consumer on television and the internet, (ii) to airport and mall kiosks, (iii) to QVC and the Home Shopping Network, (iv) to college bookstores (collectively, the "CJ Retained Channels of Trade"). See Ex. A at ¶ 1.1(a).

d.      CJ agreed to a "Non-Compete" provision which precluded CJ or anyone else from marketing, selling or distributing Pillow Pets anywhere except in (i) CJ's Retained Channels of Trade and (ii) local retailers with less than 150 stores nationwide.  See Ex. A at ¶ 1.2.  Critically, it prohibited CJ from selling Pillow Pets to mass retailers, like Target.  Id.

e.      CJ agreed to a "Confidentiality" provision that prevented CJ from disclosing or using, among other things, Ontel's pricing and marketing strategies.  Ex. A at ¶10.

7

     f.     CJ agreed that if it violated either the Non-Compete or Confidentiality provisions, it would be subject to preliminary and/or permanent injunctive relief.   Ex. A at ¶11.

20.     In return for the rights granted to Ontel under the Agreement, CJ was paid an initial royalty of $1.00 per unit of the Product sold by Ontel.  See Ex. A, ¶2.1.[1]  In addition, Ontel also paid a "producer royalty" to the producer of the commercial that Ontel licensed from CJ.  See Ex A, at ¶3.

21.     The mass retail program designed, organized and executed by Ontel was a large success.  Indeed, since the inception of the Agreement (through the present), Ontel has paid in excess of $30,000,000.00 in royalties to CJ related to the Pillow Pets products.  It is undisputed that CJ would have never garnered that level of revenue without Ontel's participation in the mass retail sale of Pillow Pets.  Simply stated, CJ did not have the plan, the contacts, the distribution network, the marketing and/or the money to build the program without Ontel.

22.     In addition to the $30,000,000+ in royalty payments that it received, CJ continued to sell Pillow Pets in the CJ Retained Channels of Trade, and in various international markets.  While the sum total of those sales was a fraction of the sales made by Ontel to mass retail, CJ's own program was somewhat lucrative to them, as well.

**CJ Breaches the Agreement by Selling Pillow Pets to Target**

23.     The Pillow Pets mass retail program was large.  During the initial term of the deal (1 year), Ontel sold over 15,000,000 Pillow Pets to mass retail.   In each

---

[1]     The Agreement was subsequently amended on multiple occasions to reflect a different royalty amount.

subsequent year, Ontel sold an average of approximately 4,000,000 – 5,000,000 Pillow Pets to mass retail, netting tens of millions of dollars in royalties to CJ.

24.     Ontel supported the Pillow Pets mass retail program by investing in excess of $100,000,000.00 in inventory and advertising, and thousands of "man hours" running and overseeing the mass retail program using expertise and knowledge that CJ simply did not have.

25.     In or about early 2013, as with most toy items, the Pillow Pets program began to experience a downward trend in mass retail sales.  As such, Ontel was left with approximately 2,000,000 Pillow Pets in inventory.  Notwithstanding that, Ontel continued to attempt to sell that inventory while, at the same time, bringing additional, new styles of Pillow Pets to mass retail, consistent with its duties under the Agreement.

26.     One way that Ontel brought new styles to mass retail was through a licensing arrangement that CJ had with the Disney Company ("Disney").  Specifically, during the period 2012-2013, Ontel produced various Disney character Pillow Pets, keeping the Pillow Pets brand and sales "fresh," while at the same time continuing to sell-off its remaining inventory of older Pillow Pet styles.  The Disney character Pillow Pets were a moderate success, selling several hundred thousand units during that period of time.

27.     Naturally, at the beginning of the program, CJ was very happy with Ontel and its efforts, as CJ was being paid tens of millions of dollars in royalties in a business that they had no knowledge, expertise or experience in.  However, as the Pillow Pets "fad" faded (like most toy items do), CJ became increasingly hostile and less cooperative with Ontel, in a calculated effort to force a premature end to the Agreement. However,

with significant remaining inventory, Ontel continued to sell the item to mass retail, despite the consistent trouble caused by CJ.

28.     In August 2014, in an effort to keep the Pillow Pets brand "fresh" at mass retail, Ontel discussed another Disney licensed character with CJ – Olaf from the hit movie *Frozen*.  CJ was, at that time, selling that item through the CJ Retained Channels of Trade and Ontel anticipated that with the popularity of the movie, an Olaf Pillow Pet would sell well at mass retail for the Christmas season of 2014.  At the same time, Ontel believed that it would keep the Pillow Pets brand relevant in mass retail which would, in turn, allow it to continue to liquidate its remaining, old, inventory at not that great of a loss to Ontel.

29.     After Ontel met with CJ and described its mass retail pricing, sales, marketing and distribution strategy to CJ, CJ, without true justification, refused to assist Ontel in developing an Olaf Pillow Pet program for mass retail.  In summary form, CJ claimed that Ontel's suggested mass retail pricing was inconsistent with CJ's own specialty retail pricing for that item, and that CJ could not allow a price point in mass retail because of its relationships with its own specialty retailers.  See Ex. C.

30.     While CJ's justification was not legitimate, and while Ontel believed it was yet another improper attempt by CJ to try and "leverage" Ontel into ending the Agreement early, Ontel continued to simply sell through its existing inventory.  CJ's refusal to assist Ontel with the mass retail Olaf certainly made Ontel's job that much more difficult.

31.     From 2014 through mid-2015, Ontel continued to try to develop additional mass retail strategies for Pillow Pets, without any cooperation from CJ.

10

32.     In early November 2015, Ontel learned that CJ – utilizing a broker introduced by Ontel to CJ – sold an Olaf character Pillow Pet to mass retail, at the very same price point that Ontel had developed and that CJ previously claimed "undermine[d] the true value" of the Olaf Pillow Pet.  Ex. C.

33.     By email dated November 11, 2015, CJ confirmed that it, in fact, sold the Olaf Pillow Pet into Target.  Ontel subsequently learned that CJ also sold several other styles of Pillow Pets into Target again, at Ontel's price point using Ontel's pricing and marketing strategy, and the broker that Ontel had introduced CJ to.

34.     CJ's sale of Pillow Pets to Target constitutes a clear breach of the Non-Compete provision of the Agreement.  Moreover, CJ's use of Ontel's pricing and marketing strategy for the Olaf Pillow Pet violates the Confidentiality provision of the Agreement.

35.     CJ's violation of those provisions of the Agreement, by CJ's very own agreement, entitles Ontel to preliminary and permanent injunctive relief pursuant to section 11 of the Agreement.

## IRREPARABLE INJURY

36.     Unless CJ is preliminarily and permanently enjoined, Ontel will suffer substantial and irreparable injury as a result of the aforementioned conduct of CJ.  Such injury will include the improper use of assets, intellectual property, and rights that Ontel has paid millions of dollars for, and created substantial goodwill in.  In addition, CJ's continued sale of Pillow Pets in violation of the Non-Compete and Confidentiality clauses of the Agreement will allow CJ to continue to misuse the mass retail pricing,

marketing and sales strategies that CJ learned through its contractual relationship with Ontel, and erode Ontel's relationship with a key retail partner, Target.

37.     As CJ recognized at the time it entered into the Agreement with Ontel, Ontel has no adequate remedy at law for such injuries.  Ontel's damages, which will be substantial, are not presently ascertainable or readily calculable with reasonable certainty.

## FIRST COUNT
### (Breach of Contract)

38.     Ontel incorporates the previous allegations as if set forth at length herein.

39.     In February 2010, CJ entered into the Agreement with Ontel.  The Agreement, among other things, provides that Ontel has the exclusive rights to market and distribute Pillow Pets to mass retailers, including Target, and that CJ will not, in any way, interfere with those rights.  Said differently, under the Agreement, CJ is precluded from marketing, distributing, or offering to sell Pillow Pets to mass retailers, including Target.

40.     The Agreement also provides CJ from using and/or disclosing Ontel's confidential and proprietary information related to Pillow Pets to any third party.

41.     In the Agreement, CJ agreed that, should it violate the prohibition against marketing, distributing or selling Pillow Pets to any mass retailer (including Target) and/or disclose Ontel's confidential and proprietary information related to Pillow Pets to any third party, CJ would voluntarily be subject to a preliminary and permanent injunction precluding CJ from continuing to so-market, distribute or sell Pillow Pets to mass retailers, and continue to improperly use and/or disclose Ontel's confidential and proprietary information related to Pillow Pets.

42.     CJ's sale of Pillow Pets to Target constitutes a breach of the Agreement.

43.     CJ's use of Ontel's pricing structures and marketing strategies as they relate to mass retail constitutes a breach of the Agreement.

44.     As a result of those breaches, Ontel has been and will be damaged and will suffer irreparable harm to its business.

45.     The acts, conduct and omissions of CJ constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions would cause substantial damage and injury to Ontel.

46.     Unless CJ is preliminarily and permanently enjoined from, directly or indirectly, continuing to sell Pillow Pets products into Target and other mass retailers, and continuing to use confidential information belonging to Ontel in support of those sales, Ontel will suffer irreparable injury for which it has no adequate remedy at law or in money damages.

## SECOND COUNT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

47.     Ontel incorporates the previous allegations as if set forth at length herein.

48.     The Agreement is governed by New Jersey law.  See Ex A.  There exists an implied covenant of good faith and fair dealing in each and every contract governed by New Jersey law.

49.     As a result of their aforementioned conduct, including (without limitation) that conduct described in paragraphs the First Count, above, above, CJ breached the implied covenant of good faith and fair dealing.

50.     As a result of that breach, CJ has been and will be damaged and will suffer irreparable harm to its business.

51.     The acts, conduct and omissions of CJ constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions would cause substantial damage and injury to Ontel.

52.     Unless CJ is preliminarily and permanently enjoined from, directly or indirectly, continuing to sell Pillow Pets products into Target and other mass retailers, and continuing to use confidential information belonging to Ontel in support of those sales, Ontel will suffer irreparable injury for which it has no adequate remedy at law or in money damages.

### THIRD COUNT
### (Unfair Competition)

53.     Ontel incorporates the previous allegations as if set forth at length herein.

54.     As set forth above, the CJ has conspired to usurp and misappropriate the rights and interests of Ontel under the Agreement.

55.     The wrongful conduct of CJ violates the general "rules of game" and of the marketplace.

56.     As a result of CJ's acts of unfair competition and other unlawful conduct, Ontel has been damaged and, if not preliminarily and permanently enjoined by this Court, Ontel will suffer irreparable injury for which it has no adequate remedy at law or in money damages.

### PRAYER FOR RELIEF

WHEREFORE, Ontel demands judgment against CJ:

A.      Preliminarily and permanently enjoining CJ, its principals and employees, and all other partnerships, corporations or other business entities owned, in any way, by

14

them, from marketing, distributing or selling Pillow Pet branded products to Target or any other mass retailer;

B.      Preliminarily and permanently enjoining CJ from using pricing and marketing plans and strategies that it learned from Ontel under the Agreement;

C.      Preliminarily and permanently enjoining CJ from entering into any agreements with any third party mass retailers related to Pillow Pets, including (without limitation) any agreements with any mass retailers whereby CJ, directly or indirectly, would supply Pillow Pets to any mass retailer;

D.      Preliminarily and permanently enjoining CJ from utilizing any confidential or proprietary business information, intellectual property or trade secrets of Ontel.

E.      Awarding attorneys' fees and costs to Ontel pursuant to the Agreement;

F.      Awarding such other and further relief as the Court deems just and equitable.

> **BESHADA FARNESE LLP**
> Attorneys for Plaintiff
> Ontel Products Corporation
>
>  _/s/Donald A. Beshada_____
> By:  Donald A. Beshada (DAB 2909)
> 108 Wanaque Avenue
> Pompton Lakes, New Jersey 07442
> Telephone:      (973) 831-9910
> Facsimile:      (973) 831-7371
> Email:          dbeshada@gmail.com

Dated: November 25, 2015

## VERIFICATION

Jason Biziak, of full age, having been duly sworn according to law, upon his oath deposes and says:

1.     I am Vice President of Product Strategy and Business Development of plaintiff Ontel Products Corporation ("Ontel").

2.     I have read the within Verified Complaint and state that the factual allegations contained therein are true to the best of my personal knowledge of the facts and circumstances.

3.     I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on this 25 day of November, 2015 in Fairfield, NJ.

By: _____
Jason Biziak

16

# EXHIBIT A

# EXHIBIT A

## MANUFACTURING, MARKETING AND DISTRIBUTION AGREEMENT

### My Pillow Pets - CJ Products and Ontel

This Agreement ("Agreement") is by and between **CJ PRODUCTS, LLC**, a California limited liability company ("Product Owner"), and **ONTEL PRODUCTS CORPORATION**, a New Jersey corporation ("Ontel"), both of which are sometimes referred to herein as a "party" or the "parties".

**WHEREAS**, Product Owner represents that it is the sole and exclusive owner of certain trademark applications, being herein licensed to Ontel, which trademarks Product Owner uses in conjunction with the sale of a plush foldable stuffed animal (in many styles), and which is currently being manufactured, marketed and sold under the "My Pillow Pets" brand (the "Product", and when more than one - "Products"); and

**WHEREAS**, Ontel is in the business, among other things, of manufacturing, advertising, marketing and distributing products in various media, including television, print, and retail; and

**WHEREAS**, the parties wish to set forth in this Agreement their understanding of the terms, and conditions upon which Product Owner will grant to Ontel rights to manufacture, import, export, use, distribute, sell, advertise, promote and otherwise exploit the Products.

**NOW THEREFORE**, in consideration of the premises and the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, the parties agree as follows:

1. **Manufacturing, Marketing and Distribution Rights**.

    1.1    **Grant of Rights**. Product Owner hereby grants to Ontel the following rights (the "Manufacturing, Marketing and Distribution Rights"), which Ontel may exercise alone or through any one or more of its affiliates:

        (a)    **Generally**. The right, license and privilege during the Term (as hereafter defined) and throughout the World, except for approximately 12 countries in which Product Owner has already appointed an exclusive third-party distributor, (the "Territory") to distribute, sell, advertise, promote and otherwise exploit the Products and all improvements and modifications thereof, by any and all means and media, in any and all markets, including but not limited to all print media, direct mail solicitation, package inserts, inbound and outbound telemarketing, credit card syndication, radio, catalog sales, retail sales, and all other channels or means of distribution now existing or hereafter developed, excluding, however, the following:

(i) direct response television (commonly referred to as infomercials or direct response spots),

(ii) the Internet,

(iii) airport and mall kiosks,

(iv) television shopping programs such as QVC and HSN,

(v) college bookstores, and

(vi) such other accounts as Product Owner and Ontel may hereafter from time to time agree to add to those retained by Product Owner,

all of which are referred to herein as the "Retained Channels of Trade";

(b) **Use of Patents**.  The right to use any U.S. and foreign patents that exist or that may issue on the Products and on like or related matter developed, owned or controlled by Product Owner (collectively referred to as the "Patents"), although at the present time Product Owner has advised Ontel that it has no such Patents or applications filed for patents;

(c) **Use of Know-how**.  The right to use any know-how in the possession or control of Product Owner which relates to the Products;

(d) **Use of Trademarks**.  The right to use any and all trademarks that Product Owner may own or control now and in the future with respect to the Products, including the trademark "My Pillow Pets" and the associated logos (the "Trademarks"), and the right to advertise, promote, market, sell and distribute the Products under or in connection with such other trademarks or identifying names or marks as Ontel may determine;

(e) **Use of Product Owner's Artwork and Instructional and Promotional Materials**.  The right to copy and use any and all artwork and instructional and promotional materials, including any videos and any product packaging, and extracts therefrom and modifications thereof, that Product Owner may own or control with respect to the Products ("Product Owner's Artwork"), copies of all of which Product Owner shall provide to Ontel for this purpose;

(f) **Names, Likenesses and Endorsements**.  The right to use the names, likenesses (including, without limitation, photographs, illustrations, films and videotapes), endorsements and testimonials of all endorsers and other persons that Product Owner may own or control with respect to the Products;

(g) **Packages**.  The right to develop such groupings, ensembles, configurations and packaging of the Products for sale as Ontel may determine; and

(h)   **Subdistributors**.  The right to appoint such subdistributors as Ontel, in its sole judgment, may deem appropriate in order to market and distribute the Products.

1.2   **Non-Compete**.  Product Owner shall not directly or indirectly, either alone or in participation with any other person or entity, engage in or be involved with manufacturing, marketing or distributing the Products or any other plush foldable stuffed animals, or other products similar in concept or function to the Products, and will use commercially reasonable efforts to prevent any other individuals or entities from manufacturing, marketing or distributing the Products, in the Territory, except for:

- in the Retained Channels of Trade, or to
- small single-owner or single store retailers, and local or regional chains of 150 stores or less to include Hallmark and Coach House - which markets can be solicited by both Product Owner and Ontel.

1.3   **Minimum Sales Requirements**.  Ontel shall not have any minimum sales requirements under this Agreement.  However, extensions of the Term of this Agreement are subject to Ontel's meeting certain minimum royalty levels, as described in Section 8 hereof.

1.4   **Prices**.  Ontel, in its sole judgment, shall have the right to sell and distribute the Products at such prices, and on such terms and conditions, as Ontel may establish.  Ontel shall from time to time consult with Product Owner as to an appropriate manufacturer's suggest retail price for the Products.

1.5   **Quality Control**.   Ontel shall adhere to any reasonable requests and directions of Product Owner relating to the maintenance of the quality of the Products manufactured pursuant to the terms of this Agreement, and any advertising, point of sale displays, packaging or any other materials Ontel uses in connection with the manufacture, marketing or sale of the Products (collectively, "Related Items") and will specifically obtain Product Owner's approval of the final quality and design of the Products and Related Items before such Products are sold or Related Items displayed, which approval will not be unreasonably withheld, conditioned or delayed.

1.6   **Third Party Contract Manufacturer**.  Ontel intends and is authorized to manufacture the Products by contract with a third party manufacturer.

1.7   **Number of Different Products  to be Manufactured by Ontel**.  Ontel is authorized to manufacture as many different styles of as Ontel shall determine is appropriate for its channels of trade.  Ontel is initially planning on manufacturing up to four different Product styles but may change this over time.

1.8   **Introduction of Product Owner to the Third Party Contract Manufacturer or Buyer's Agent**.  If requested by Product Owner, Ontel will introduce

Product Owner to Ontel's third party contract manufacturer or buyer's agent so that Product Owner may purchase from said manufacturer or buyer's agent Products for sale in the Retained Channels of Trade and those channels where both parties have rights to market.

1.9     **Copies of Factory Invoices to be Provided by Third Party Manufacturer or Buyer's Agent to Product Owner**.  Ontel will instruct and authorize the third party manufacturer or buyer's agent to provide to Product Owner copies of its invoices (omitting pricing information) to Ontel at the same time that the invoices are provided to Ontel by the third party manufacturer or buyer's agent.

1.10    **Labeling of Product to Distinguish Ontel's from Product Owner's**.  Ontel will label the Product that it purchases from the third party manufacturer in a manner that would allow the parties to identify that the Product being sold by Ontel is not the same product as that being sold by Product Owner in the Retained Channels of Trade, such as by putting "Official Licensed Product" or "Distributed by Ontel Products Corporation" or other distinguishing language on the product tag.

1.11.   **Notification of Countries Where Ontel is To Commence Sales**.  Ontel will provide advance notice to Product Owner of the countries outside the United States and Canada in sufficient time prior to delivery of Product to such countries so that Product Owner can consider whether or not to file applications for trademark registration in such countries.

2.      **Royalty to Product Owner**.

2.1     **Amount of Royalty**.  Ontel shall pay Product Owner a royalty equal to One Dollar ($1.00) for each Product sold by Ontel, less returns, excluding sales made by Ontel to Product Owner.  In no event will credit for customer returns for defective Products exceed 5% of total units sold each calendar year, prorated for a portion of a calendar year.

2.2     **Reporting and Remittances; Review of Ontel's Books**.  All royalties shall be paid to Product Owner on a calendar quarter basis and within 30 days of the close of the quarter.  Each payment made by Ontel to Product Owner shall be accompanied by an accounting statement setting forth the calculation of the amount of royalty shown thereby to be due to Product Owner for such quarter, including a spreadsheet showing units sold by style and country and sufficient information to describe the return activity.

Product Owner shall have the right to review the books and records of Ontel that pertain to the sale of the Products on reasonable advance notice and at reasonable intervals but not to exceed one time in each calendar year.  If the review reveals a shortage in the amount due to Product Owner that is in excess of 3% of its entitlement, over a four calendar quarter period then Ontel will pay the actual, out-of-pocket third party costs of the review to the extent that such costs are reasonable.

3.    **Royalties to Infomercials, Inc.**  Product Owner will provide to Ontel a copy of Product Owner's agreement with Infomercial, Inc., the producer of an existing direct response commercial for the Product.  Ontel will make payment of royalties due thereunder to Infomercials, Inc., based on Ontel's own sales of the Products and pursuant to an agreement to be separately negotiated between Ontel and Infomercials, Inc.

4.    **Proprietary Rights.**

4.1    **Product Owner's Intellectual Property.**

(a)    **Generally.**  Subject to the rights granted to Ontel under this Agreement, all right, title and interest in and to the design of the Products, the Patents, Trademarks, and Product Owner's Artwork (collectively, "Product Owner's Intellectual Property"), is and shall remain the sole property of Product Owner, and neither Ontel nor any third party shall acquire any right, title or interest in Product Owner's Intellectual Property by virtue of this Agreement or otherwise, except as expressly provided herein.  Any unauthorized use of Product Owner's Intellectual Property by Ontel shall be deemed an infringement of the rights of Product Owner therein.  Ontel shall not in any way or at any time dispute or attack the validity or contest the rights of Product Owner in or to any of Product Owner's Intellectual Property.  The provisions of this Section 4.1(a) are subject in all respects to the accuracy of the representations and warranties of Product Owner given pursuant to Section 5.2.  Ontel's and any of its affiliates' use of Product Owner's Intellectual Property and any resulting goodwill shall inure to Licensor's exclusive benefit.

b)    **Enforcement of Rights.**  Product Owner may at its expense enforce Product Owner's rights in Product Owner's Intellectual Property against infringement thereof.  If Ontel requests Product Owner to enforce such rights and Product Owner declines to do so, Ontel shall have the right (but shall not be required) to enforce such rights, and may do so in Product Owner's name with Product Owner's written agreement.  The party enforcing the rights shall be responsible for its own legal fees and expenses incurred in such enforcement efforts, but shall first be reimbursed for such expenditures from any recovery obtained.  All monies recovered in excess of such expenditures shall be paid to the party suffering actual loss to the extent of such loss, and any amount remaining shall be shared equally by Ontel and by Product Owner.  Ontel shall fully inform Product Owner of the status of any such enforcement efforts undertaken by Ontel.

4.2    **Ontel's Intellectual Property.**  All right, title and interest in and to the entire editorial, visual, audio, and graphic content of all advertisements and promotional materials developed by Ontel in connection with its activities under this Agreement, any commercials that Ontel produces for purposes of loop to loop tapes for in-store displays, and all related materials and the contents thereof (collectively, "Ontel's Intellectual Property") shall be and remain the sole property of Ontel, and neither Product Owner nor any third party shall acquire any right, title or interest in Ontel's Intellectual Property by virtue of this Agreement or otherwise.  Any unauthorized use of any of Ontel's Intellectual Property by

Product Owner shall be deemed an infringement of the rights of Ontel therein.  Product Owner shall not in any way or at any time dispute or attack the validity or contest the rights of Ontel in or to any of Ontel's Intellectual Property. Any modifications to the Products developed by Ontel, to the extent patentable, and any trademarks developed by Ontel to be used in conjunction with sales of the Products shall be licensed by Ontel to Product Owner on a non-exclusive, royalty-free, perpetual basis, on termination of Ontel's marketing rights at the request of Product Owner.

5.      **Representations, Warranties and Covenants**.

    5.1     **The Products**.  Product Owner represents, warrants and covenants to Ontel that:

        (a)     **Information**.  All information provided to Ontel by Product Owner relating to the Products is and will be, to the best of Product Owner's knowledge and belief, true and correct, including without limitation all information regarding the effectiveness, quality, characteristics or fitness of the Products;

        (b)     **Substantiation**.  Product Owner will provide to Ontel all information in Product Owner's possession or control which substantiates all claims made by the Product Owner to Ontel about the Products; and

        (c)     **Production Assistance**.  Product Owner will assist Ontel's third party contract manufacturer by providing all know-how necessary or helpful in the manufacturing and production of the Product.

    5.2     **Proprietary Rights**.  Product Owner represents, warrants and covenants to Ontel that:

        (a)     **Product Owner's Intellectual Property**.  Product Owner owns or otherwise controls or shall own or otherwise control all right, title and interest in and to Product Owner's Intellectual Property, which currently consists of certain copyright registrations and the trademark applications set forth in section 5.2(e);

        (b)     **Power and Authority**.  Product Owner has and shall have all necessary power and authority to grant to Ontel all of the rights and privileges granted pursuant to this Agreement;

        (c)     **No Infringement**.  To the best of Product Owner's knowledge, neither the granting of the rights and privileges granted hereunder nor the exercise thereof by Ontel in accordance with the terms of this Agreement will infringe or otherwise violate the intellectual property or other proprietary rights of any person or entity;

        (d)     **No Adverse Claims**.  Product Owner has not been and is not, as of the date of this Agreement, a party to any litigation enforcing or defending Product

Owner's rights in, to or with respect to the Products or any of Product Owner's Intellectual Property, and other than a claim of trademark infringement by the owner of the trademark "My Pillow," information with respect to which Product Owner has already provided to Ontel, is not aware of any claims or demands made or threatened by any person or entity involving the validity of Product Owner's rights in, to or with respect to the Products or any of Product Owner's Intellectual Property; and

        (e)    **Applicable Patents, Copyrights, Trademarks and Licenses**. Product Owner will at the time of execution of this Agreement, and thereafter, provide Ontel with copies of all patents, patent applications, abstracts of all copyright registrations, copyright applications, trademark registrations, trademark applications, licenses and other agreements and instruments relating to the Products and Product Owner's Intellectual Property (and all amendments, supplements, and modifications thereof) which are now in existence or which Product Owner shall obtain, file or enter into during the Term of this Agreement. Product Owner represents that it owns U.S. trademark registration application numbers 77387642, 77387634, 77933633, and 77940244.

        5.3    **Other Warranties**. The warranties and representations set forth in this Section 5 and elsewhere in this Agreement are in addition to and without prejudice to all other warranties expressed or implied by law.

        5.4    **Ontel to Comply with All Applicable Laws, Rules and Regulations**. Ontel will use reasonable commercial efforts to comply with all applicable laws, rules and regulations relating to its activities in manufacturing, marketing and distributing the Products, but a failure by Ontel to comply with such laws, rules and regulations shall not constitute a material breach of this Agreement if the effect of such failure poses no material, financial detriment to Product Owner.

        6.    **Additional Representations and Warranties**. Each party represents and warrants to the other as follows:

        6.1    **Power and Authority**. It has all requisite power and authority to enter into this Agreement, and has duly authorized by all necessary action the execution and delivery hereof by the officer or individual whose name is signed on its behalf below.

        6.2    **No Conflict**. The execution and delivery of this Agreement by it, and the performance of its obligations hereunder, do not and will not conflict with or result in a breach of or a default under its organizational instruments or any other agreement, instrument, order, law or regulation applicable to it or by which it may be bound.

        6.3    **Binding Effect**. This Agreement has duly and validly executed and delivered by it and constitutes its valid and legally binding obligation, enforceable in accordance with it terms.

7.    **Indemnification**.

7.1    **By Ontel**.

(a)    **Generally**.  Subject to Section 7.1 (b), Ontel shall defend, indemnify and hold harmless Product Owner and its affiliated companies and their respective officers, directors, shareholders, employees, licensees, agents, successors and assigns from and against any and all without limitation, claims, damages, judgments, awards, settlements, investigations, costs, and reasonable attorneys fees and disbursements (collectively "Claims") which any of them may incur or become obligated to pay arising out of or resulting from (i) the breach by Ontel of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement and (ii) any defect in the Product sold by Ontel.

(b)    **Exceptions**.  Ontel shall have no duty under Section 7.1(a) or otherwise to defend, indemnify or hold harmless with respect to any Claims which (i) arise out of or result from the breach by Product Owner of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement; or (ii) are subject to Product Owner's duty to defend, indemnify and hold harmless pursuant to Section 7.2(a).

7.2    **By Product Owner**.

(a)    **Generally**.  Subject to Section 7.2(b), Product Owner shall defend, indemnify and hold harmless Ontel, its affiliated companies and their respective officers, directors, shareholders, employees, licensees, agents, successors and assigns from and against any and all Claims which any of them may incur or become obligated to pay arising out of or resulting from the breach by Product Owner of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement.

(b)    **Exceptions**.  Product Owner shall have no duty under Section 7.2(a) or otherwise to defend, indemnify or hold harmless with respect to any Claims which (i) arise out of or result from the breach by Ontel of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement; or (ii) are subject to Ontel's duty to defend, indemnify and hold harmless pursuant to Section 7.1(a).

7.3    **Procedure**.  Promptly after learning of the occurrence of any event which may give rise to it rights under the provisions of this Section 7, any party seeking to enforce such right (a "Claiming Person") shall give written notice of such matter to the party against whom enforcement of such rights is sought (the "Indemnifying Party").  The Claiming Person shall cooperate with the Indemnifying Party in the negotiation, compromise and defense of any such matter. The Indemnifying Party shall be in charge of and control such negotiations, compromise and defense and shall have the right to select counsel with respect thereto, provided that the Indemnifying Party shall

promptly notify the Claiming Person of all material developments in the matter.  In no event shall the Indemnifying Party compromise or settle any such matter without the prior consent of the Claiming Person, which shall not be bound by any such compromise or settlement absent its prior consent.

8.    **Term**.

Unless sooner terminated in accordance with the provisions of Section 9, this Agreement shall remain in full force and effect until March 1, 2011  (the "Initial Term").  This Agreement shall then be automatically extended for unlimited additional, successive one-year periods (the "Extension Periods", which together with the Initial Term are herein referred to as the "Term") subject to the following. If Ontel has not paid, or accrued for payment and made payment within 31 days following the end of the Initial Term, royalties of at least $1,000,000 (One Million Dollars) on the basis of sales of the Product, and 31 days following the end of the first Extension Period royalties in a like amount, and 31 days following the end of each subsequent Extension Period royalties of at least $500,000, Product Owner shall have a window during the month of April of each year following which the aforesaid minimums were not met to send written notice to Ontel that Product Owner elects to terminate this Agreement, in which case this Agreement will terminate at the end of the month following receipt by Ontel of such written notice. Notwithstanding the foregoing minimums, if Ontel fails to achieve the minimum sales needed to extend the Term, it may, however, make up a portion of the shortfall in an amount not in excess of 20% of the minimum condition each period by payment of cash that is non-refundable and non-creditable against future royalties that may be owing.

Payments of royalties shall be considered cumulative for one year only, so that if Ontel has paid in excess of the minimum royalties condition in one period, the minimum royalties condition in the immediately following period will be correspondingly reduced to the extent of such excess.  By way of example, if in the first year of this Agreement Ontel pays $2.5 million in royalties from actual sales of the Products, the Term will extend through February, 2013 whether or not Ontel sells any Products during the year March 1, 2012 through February 2013.  To extend the Term again through February, 2014 without being subject to any risk of termination by Product Owner, Ontel would have to meet the then $500,000 minimum royalty condition (or 80% of it with the difference made up in cash) for the year March 1, 2012 through February 2013.

9.    **Termination**.

9.1    **Termination Events**.

(a)    **Election by Ontel not to Proceed**.  If Ontel determines at any time during the Term that it does not intend to continue with marketing of the Products, then Ontel shall promptly notify Product Owner and this Agreement, subject to the provisions of Section 9.3, shall terminate on Product Owner's receipt of such notice.

-9-

(b)     **Termination Upon Breach**.   Either party may terminate this Agreement upon 45 days written notice to the other party upon the material breach by the other party of any of its material representations, warranties, covenants or agreements contained in this Agreement.  Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall:

(i) have been fully cured to the reasonable satisfaction of the nonbreaching party within such 45 day period, or

(ii) not be capable of cure within such 45 days, but can be cured within a reasonable time thereafter, and the breaching party is taking reasonable steps to effect such a cure and it is in fact cured within 75 days,

then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect.  Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

9.2     **Obligations Deemed Fulfilled in the Event of Early Termination**.   Any early termination pursuant to Section 9.1(a) of this Agreement shall not be viewed to be a breach of this Agreement. Unless either of the parties has separately breached a commitment made elsewhere in this Agreement, such parties shall be deemed to have fulfilled all of their obligations hereunder, except those which by their nature survive the termination of the Term (e.g. warranties and representations, payment obligations, confidentiality and indemnifications, etc.).

9.3     **Limited Sales Rights After Termination**.  Following the expiration or termination of the Manufacturing, Marketing and Distribution Rights granted in Section 1.1 of this Agreement, Ontel shall retain non-exclusive rights to advertise, market, and sell the Products in the same manner as provided for in this Agreement until it has sold all of its existing inventory of the Products and any Products for which it has placed a purchase order or for which it has entered into an agreement of sale; provided, however, that Ontel will offer to Product Owner the opportunity to purchase from Ontel, at Ontel's manufacturing cost plus 10% plus shipping, any remaining Product not needed by Ontel to fulfill its contemplated customer orders and any Product that Ontel plans to sell for a price that is equal to or less than Ontel's manufacturing cost plus 10%.

10.     **Confidentiality**.

10.1     **Generally**.  All customer lists, price lists, written and unwritten marketing plans, techniques, methods and data, sales and transaction data, all technology and know-how relating to the manufacture of the Products, and other information designated by either party as being confidential or a trade secret, shall constitute

confidential information of such party ("Confidential Information"). Either party receiving Confidential Information (a "Receiving Party") from the other party (a "Conveying Party") shall hold all Confidential Information in the strictest confidence and shall protect all Confidential Information of the Conveying Party with at least the same degree of care that the Receiving Party exercises with respect to its own proprietary information. Without the prior written consent of the Conveying Party, the Receiving Party shall not use, disclose, divulge or otherwise disseminate any Confidential Information of the Conveying Party to any person or entity, except for the Receiving Party's attorneys, accountants and such other professionals as the Receiving Party may retain in order for it to perform and enforce the provisions of this Agreement.

      10.2   **Exceptions**. Notwithstanding Section 10.1, the Receiving Party shall have no obligation with respect to any Confidential Information of the Conveying Party which (i) is or becomes within the public domain through no act of the Receiving Party in breach of this Agreement, (ii) was lawfully in the possession of the Receiving Party without any restriction on use or disclosure prior to its disclosure in connection with this Agreement and the negotiations leading to this Agreement, (iii) is lawfully received from another source subsequent to the date of this Agreement without any restriction on use or disclosure, or (iv) is required to be disclosed by order of any court of competent jurisdiction or other governmental authority (provided in such latter case, however, that the Receiving Party shall timely inform the Conveying Party of all such legal or governmental proceedings so that the Conveying Party may attempt by appropriate legal means to limit such disclosure, and the Receiving Party shall further use its best efforts to limit the disclosure and maintain confidentiality to the maximum extent possible).

      11.   **Injunction**. Each party acknowledges that a breach of the obligations not to compete under Section 1.2, and/or of confidentiality under Section 10 will result in irreparable and continuing damage to the non-breaching party for which there will be no adequate remedy at law. Accordingly, in the event of any such breach, the non-breaching party shall be entitled to temporary and/or permanent injunctive relief and/or an order for specific performance, without bond, with respect to such breach. Neither party shall oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which the non-breaching party may have upon the breach of either of the other party's obligation of exclusivity or confidentiality hereunder. The non-breaching party may pursue such relief in either a court or by arbitration under Section 15.6, at its discretion.

      12.   **Independent Contractor**. No party or any of its officers, employees, agents or representatives is a partner, employee or agent of any other party for any purpose whatsoever. Rather, each party is and shall at all times remain an independent contractor. No party has, nor shall it hold itself out at as having, any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding upon the other party, unless such other party shall consent thereto in writing. Each party shall have the right to appoint and shall be solely responsible for its own employees, agents and representatives, who shall be at such party's own risk, expense

and supervision and shall not have any claim against any other party for compensation or reimbursement.

13.   **Force Majeure**.  In the event of war, fire, flood, labor troubles, strike, riot, act of governmental authority, acts of God, or other similar contingencies beyond the reasonable control of either of the parties interfering with the performance of the obligations of such party, the obligations so affected shall be deferred to the extent necessitated by such event or contingency without liability, but this Agreement shall otherwise remain unaffected.  Notice with full details of any circumstances referenced herein shall be given by the affected party to the other party, promptly after its occurrence.  The affected party shall use due diligence, where practicable, to minimize the effects of or end any such event.

14.   **Further Actions**.   The parties agree to execute such additional documents and to perform all such other and further acts as may be necessary or desirable to carry out the purposes and intentions of this Agreement.

15.   **Miscellaneous**.

15.1   **Notices**.  All notices, requests, instructions, consents and other communications to be given pursuant to this Agreement shall be in writing and shall be deemed received (i) on the same day if delivered in person, by same-day courier or by e-mail, telegraph, telex or facsimile transmission, (ii) on the next day if delivered by overnight mail or courier, or (iii) on the date indicated on the return receipt, or if there is no such receipt, on the third calendar day (excluding Sundays) after being sent by certified or registered mail, postage prepaid, to the party for whom intended to the following addresses:

### If to Product Owner:

CJ Products, LLC
4040 Calle Platino
Suite 123
Oceanside, California 92056
Attn: Clint Telfer, President
Fax No.: (760) 724-7215
E-mail: jennifer@mypillowpets.com

### If to Ontel:

Ontel Products Corporation
21 Law Drive
Fairfield, New Jersey 07004
Attn: Chuck Khubani, President
      with copy to Mike Wade, CFO and COO
Fax No.: (973) 439-9025

-12-

E-mail: chuck@ontelproducts.com,
   with copy to wade@ontelproducts.com

Each party may by written notice given to the other in accordance with this Agreement change the address to which notices to such party are to be delivered.

15.2   **Entire Agreement**. This Agreement contains the entire understanding of the parties and supersedes all prior agreements and understandings, whether written or oral, between them with respect to the subject matter hereof. Each party has executed this Agreement without reliance upon any promise, representation or warranty other than those expressly set forth herein.

15.3   **Amendment**. No amendment of this Agreement shall be effective unless embodied in a written instrument executed by both of the parties.

15.4   **Waiver of Breach**. The failure of any party hereto at any time to enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provisions, or in any way to affect the validity of this Agreement or any provisions hereof or the right of any party to thereafter enforce each and every provision of this Agreement. No waiver of any breach of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed by the party against which enforcement of such waiver is sought; and no waiver of any such breach shall be construed or deemed to be a waiver of any other or subsequent breach.

15.5   **Assignability**. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns. Both parties hereto can assign their respective rights under this Agreement, but any such assignment shall not relieve such parties from their obligations contained herein.

15.6   **Governing Law, Arbitration**. This Agreement shall be governed by and construed in accordance with the internal laws of the State where any arbitration may be brought without regard to conflict of laws principles. The parties agree that all disputes arising out of or related to this Agreement, whether before or after its termination, shall be resolved by final, mandatory, binding arbitration, utilizing the American Arbitration Association, in or near Fairfield, New Jersey if brought by Product Owner and in or near Los Angeles, California if brought by Ontel, with one arbitrator,. Counterclaims may be brought where the action is initially brought. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

15.6   Attorneys' Fees. The prevailing party in any action to interpret or enforce the terms of this Agreement shall be entitled to recover its actual attorneys' fees and costs incurred in such action from the losing party.

15.7   **No Representation as to Extent of Sales**. Notwithstanding the minimums required to maintain the license, Ontel has not made and does not hereby make any representation or warranty with respect to the extent or volume it may achieve

-13-

in the sale or other exploitation of the Products hereunder. Ontel shall make such effort to exploit successfully the Products and the related rights herein granted as it may determine in accordance with its business judgment; however, Product Owner recognizes and acknowledges that such matters are speculative and agrees that the judgment of Ontel and its related companies or licensees in regard to any such matters shall be binding and conclusive upon Product Owner. Product Owner agrees that it will not make any claim nor shall any liability be imposed upon Ontel based upon any claim that more or better business could have been done than was actually obtained or done by Ontel or any of its related companies or licensees, or that better prices or terms could have been obtained.

15.8     **Severability**. All of the provisions of this Agreement are intended to be distinct and several. If any provision of this Agreement is or is declared to be invalid or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such invalidity or unenforceability. Such invalidity or unenforceability shall not affect either the balance of such provision, to the extent it is not invalid or unenforceable, or the remaining provisions hereof, or render invalid or unenforceable such provision in any other jurisdiction.

15.9     **Headings**. The headings of sections and subsections have been included for convenience only and shall not be considered in interpreting this Agreement.

15.10.  **Full Execution Required; Counterparts; Facsimiles**. This Agreement shall not become effective unless and until fully executed by all proposed parties hereto. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered by electronic facsimile (including scanning) transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another, and signatures on a facsimile copy hereof shall be deemed authorized original signatures.

       **IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed on the date last written below.

**CJ PRODUCTS, LLC**                    **ONTEL PRODUCTS CORPORATION**

By: _____  2/24/10         By: _____  3-2-2010
     Jennifer Telfer      Date              JASON RYZIAK           Date
     Vice President                         VICE PRESIDENT

# EXHIBIT B

# EXHIBIT B

From: <MAIZESLAW@aol.com>
Date: Wed, Nov 11, 2015 at 5:58 PM
Subject: Re: Ontel Intl Liquidation
To: dbeshada@gmail.com


Don:

Sorry for the delay in getting back to you re PillowPets  folding plush to Target. As I understand it, your client is now—after it has breached the parties' agreement in a variety of ways and an arbitration proceeding has been filed and is pending—is asserting that my client has likewise breached the agreement by delivering folding plush to Target.

Your client knows, or should know, that this in fact is the case, and was specifically advised that this would occur in mitigation of damages that was caused by your client's breaches of the parties' agreement that continue to date.

Obviously, we can sort this through in the arbitration, so I am providing you herewith a spreadsheet containing my client's YTD sales re: above. Your client can make the assertion that these sales are breaches, but my client will, and does, assert that the same are not breaches at all but required mitigation efforts to reduce damages caused by your client's demonstrated actions.

My client advises me as follows:

- Since 2012, Ontel had refused to place new Pillow Pets SKUs into the marketplace. Hot licensed entities like Perry the Platypus, Eeyore, Monsters Inc. and Olaf were not placed into Ontel's avenues of distribution despite CJ's continued requests.

- In 2013 CJ had a substantial commitment for Pillow Pets plush by Barnes and Noble. CJ approached Ontel and asked if CJ could directly distribute the product to that company and throw back a reverse royalty to Ontel. Ontel did not allow CJ to distribute to Barnes and Noble. Ontel chose not to sell to Barnes and Noble which ultimately cost CJ Products royalty or direct revenue.

- In 2014, CJ sold appx. 125,000 units of Olaf Pillow Pets to primarily specialty accounts. Ontel refused to sell the product to mass retailers electing instead to concentrate on an Olaf Dream Lite which was not approved by Disney. Ontel typically sells 10 times the amount of product by volume than does CJ. By refusing to sell the Olaf Pillow Pets, Ontel potentially cost CJ Products in excess of $1 million in royalty revenue.

- In December 2014 in a conference call between Chuck Khubani, Jennifer Telfer and Larry Boisjolie, Chuck reflected that Ontel would not be selling any new Pillow Pets SKUs. He claimed that Ontel elected instead to concentrate on liquidation of overstock Pillow Pets products.

- In January, Clint Telfer, Jennifer Telfer, Stuart Cohen and sales rep. Jim Stetler met at the Target facility in Minnesota with the Target buyer. The Target buyer was shown folding plush Pillow Pets product. The Target buyer reflected that Ontel neglected to show Target any Pillow Pets product other than Dream Lites. CJ did not show Dream Lites product to Target since Ontel was performing its fiduciary duty and trying to sell Dream Lites to that retailer.

- In or about March 2015 this same statement was issued to Clint Telfer and Larry Boisjolie during a phone conversation with Chuck Khubani. Clint informed Chuck that CJ had no option but to try and pursue this and other retail options directly.

- In August 2015, Target committed to buying Pillow Pets folding plush from CJ Products. Target concurrently committed to buying Dream Lites from Ontel. At no time did CJ interfere with that commitment.

- Product began distribution into Target in October 2015, in mitigation.

Regards,

Michael H. Maizes, Esq.
Maizes & Maizes LLP
2027 Williamsbridge Road-2nd Fl
Bronx, NY 10461
718-823-4000;12
Fax 914-992-7853
Cell: 914-980-1045
Email: maizeslaw@aol.com
Web: maizeslaw.wix.com/maizeslaw
Linkedin: www.linkedin.com/pub/michael-maizes/11/5b0/889
Bar Admissions: NY, NJ, FL

800 Westchester Avenue-Suite 345N
Rye Brook, NY 10573
914-251-1112;113
Web: www.sfment.com

This email may be attorney-client privileged. Please excuse spelling and grammatical errors or auto correct miscues.

# EXHIBIT C

# EXHIBIT C

**From:** Clint Telfer [mailto:clint@mypillowpets.com]
**Sent:** Monday, August 18, 2014 2:17 PM
**To:** Amar Khubani; Chuck Khubani
**Cc:** MAIZESLAW@aol.com; Mike Wade
**Subject:** Olaf

<span style="color:red">REDACTED</span>

Amar,

As much as we appreciate the effort to sell Olaf in the 4th quarter, we feel it is not in the company's best interest to follow the plan you have outlined for the following reasons:

•        The $ ▮▮▮ price point undermines the true value of a very hot product this holiday season.  We have had extraordinary success with the $29.99 MSRP and believe it would be extremely detrimental to our direct customers if a ▮▮▮ product was pushed into a mass retailer.  You claim the mass retailers will not bite on the ▮▮▮ price point (or ▮▮▮ for that matter) and we simply do not agree.

•        Creating a 16" Olaf will confuse the customer and is not the size CJ wishes to see in the market.  Olaf can be instrumental in revitalizing the Pillow Pets® folding plush line for the public.  Introducing a substandard or "value" size is going to send a message to the consumer that Pillow Pets no longer represents quality.  We are not Jay at Play nor do we aspire to be so with a substandard product.

•        CJ is not willing to entertain royalty reductions for Olaf.  If the math does not work for Ontel, don't do it.

•        We will not approach Disney for a royalty reduction.  The ink is barely dry on the contract and we do not want to begin our new relationship pleading for reductions.  Besides, Olaf is the hot property for this holiday and Disney has no inspiration to reduce their contracted percentage especially with this size of an order.  To be clear, you may not approach Disney directly for reductions.  If the math does not work for Ontel, don't do it.

•        In order for you to directly produce the product, your samples would need to be produced and approved by Jennifer and Disney before you would spring into production.  Because we are so late in the season, it will be very difficult if not impossible to correctly move through the process and meet production schedules.

We did make you aware of the popularity of the Olaf 18" pillow a few months ago.  If you had acted on this sooner we would have had plenty of time to maybe work something out.


Thanks,


Clint Telfer

**Owner, CJ Products LLC**

**Pillow Pets/CJ Products, LLC**

(760) 724-7225

www.pillowpets.com

